UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RONALD CECIL CARDWELL,

Petitioner,

Case No. 2:21-cv-12875
Hon. Denise Page Hood

v.

GARY MINIARD,

Respondent.
_______________________________________/

**OPINION AND ORDER (1) DENYING PETITION FOR WRIT OF HABEAS CORPUS, AND (2) DENYING A CERTIFICATE OF APPEALABILITY**

Michigan prisoner Ronald Cecil Cardwell filed this petition for writ of habeas corpus under 28 U.S.C. § 2254. The petition challenges Cardwell's Genesee Circuit Court jury trial conviction of kidnapping, MICH. COMP. LAWS § 750.349(1)(c), assault by strangulation, MICH. COMP. LAWS §750.84(1)(b), and domestic violence. MICH. COMP. LAWS § 750.81(4). The Court stayed the case while Cardwell pursued state post-conviction review. Having now returned from state court, the Court finds that Cardwell fails to demonstrate entitlement to habeas relief.

## I. Background

Cardwell was charged with confining and sexually assaulting Amanda Iltis at his house in December 2016 when she came over to retrieve diapers for their infant son. The central claim presented in Cardwell's habeas petition challenges the trial

court's decision to allow the prosecutor to present substantial evidence that Cardwell also sexually assaulted Iltis in January 2016.

Iltis testified at the preliminary examination for the earlier incident. (ECF No. 16-2 at 7-29). She testified that on the evening of January 17, 2016, she was at her Flint home with her two young children, aged one and four. Cardwell is the father of her one-year-old son, Tres. Iltis was waiting for her boyfriend, Devon, to pick her up. Instead, Iltis received a threatening text message from Cardwell that he was at her front door and wanted to see his son before he hurt her new boyfriend.

Iltis and Cardwell had been in a relationship that ended five or six months previously. She did not want Cardwell to come into her house. She locked the front door and started to put jackets on the children so they could escape. Meanwhile, Cardwell went around to the back of the house and entered through a sliding door. Cardwell grabbed Iltis and forced her into the bedroom. Iltis had recently accused Cardwell of wanting to rape her, upsetting him. Cardwell told Iltis, "You want to know what rape looks like, this is what rape looks like." (ECF No. 16-2 at 15).

The kids were outside the door crying. According to Iltis, Cardwell threw her onto the bed and forced her pants off. Iltis fought back, but Cardwell was able to penetrate her vagina with his fingers. She physically resisted Cardwell's attempt to penetrate her vagina with his penis.

While Cardwell continued to wrestle and lay on top of Iltis, Devon arrived. He pulled Cardwell off Iltis, and the two men started to fight. Iltis ran across the street to a neighbor's house and asked him to call 9-1-1. She then ran back to her house for her children. Cardwell had Tres in his arms, and Iltis struggled to get him back while Devon fought with him. Cardwell eventually fled the house on foot, but after a short chase, Devon and another neighbor tackled and restrained him until police arrived. Iltis was taken to a hospital were a rape kit was performed.

Cardwell initially spent a brief period in jail for this earlier incident. The current offense happened shortly after his release. (ECF No. 16-12, at 3).[1]

Iltis also testified at the preliminary examination for the second offense. (ECF No. 16-3, at 5-22). She testified that on the afternoon of December 16, 2016, she went to a house in Flint that she previously shared with Cardwell. She went there to pick up diapers for Tres. She carried Tres to an upstairs bedroom to change his diaper. Cardwell followed her into the room.

Iltis testified that Cardwell then demanded that they have sex, and she refused. Cardwell took Tres from Iltis and put him outside of the room. Iltis tried to get out through a window, but it was locked. Cardwell pulled her onto a bed. Iltis told

[1] Cardwell pled guilty to the reduced charge of assault with intent to commit great bodily harm for the first incident, and he was on probation at the time of the second incident. Following sentencing in the present case, he was resentenced on the earlier charge to 26 months to 10 years in prison. *See* https://mdocweb.state.mi.us/OTIS2.

Cardwell that if he was going to make her do this, at least he could allow her to get alcohol so she wouldn't have to think about what was happening. The ruse worked, and Cardwell allowed Iltis to go downstairs. As Cardwell put on his shoes, Iltis left through the front door. She saw Cardwell's friend in the driveway and thought Cardwell would not do anything with the other man present. Instead, Cardwell told his friend to pull off, and he forced Iltis back inside the house.

According to Iltis, Cardwell then threw her on a couch and started choking her. He then forced her to the staircase and continued to choke her there. Cardwell pulled her pants down and forced her to have sex with him. After he was finished, Cardwell agreed to give Iltis back her phone and keys if she promised not to call the police. He retrieved a Bible from the kitchen and made Iltis swear on it that she would not call the police. Cardwell then apologized and allowed Iltis to leave with Tres.

Iltis immediately went around the corner to a convenience store and called 9-1-1. She met police officers at the store and then went to the hospital for a rape kit. Iltis had injuries to her neck, back, and arms, and she had tears in her vagina.

At a pretrial hearing for the second incident, the trial court decided that the prosecutor would be allowed to offer evidence regarding the first episode at trial. (ECF No. 16-12, at 5).

At trial, prior to jury selection, Iltis was called to the witness stand and indicated that she would refuse to testify. Iltis explained, "I am not mentally able to testify. I do not want to testify. I'm refusing to testify. If I have to go to jail over that then so be it, but I don't see any justice in that…. I'm going to be sick." Iltis was crying, shaking, and visibly distraught. The court declared her an unavailable witness. (ECF No. 16-14, at 4-8).

The prosecutor called Ann Kita, an expert in domestic violence, to testify at trial regarding the reasons domestic abuse victims might not cooperate in the prosecution of their abusers. (*Id.* at 233-50).

Flint police officer Tonya Fields testified that she responded to the convenience store after the second incident. She spoke with Iltis, who was visibly upset. Fields saw red marks on both sides of Iltis's neck. She had a toddler with her. Iltis accused Cardwell of choking her and forcing her to have sex. (*Id.* at 264-69).

Seargent Todd Lanning testified that he worked at the jail. He played recorded phone calls made by Cardwell to Iltis from jail. (*Id.* at 293-302).

Dr. Samantha Hauff testified that she examined Iltis at Hurley Medical Center after the second incident. Iltis told Hauff that she had nonconsensual sex, that she had been choked, and had injured her lower back against the stairs. Hauff noted the bruising on Iltis's neck, and she opined that it was consistent with strangulation. (ECF No. 16-16, at 10-19).

Renee Burmister, a SANE nurse, testified that she also examined Iltis. Iltis told her that Cardwell dragged her from the driveway into the house and onto the staircase. Iltis told Burnister that he choked her, pulled her pants down, and then forced her to have sex. Burnister took photographs of the bruising and scratches. (*Id.* at 29-59).

Because Iltis was an unavailable witness, her testimony from both preliminary examinations was read to the jury. (*Id.* at 74-116; 169-205).

Flint Police Sergeant Troy Simpson testified that he interviewed Iltis at the store following the second incident. Iltis was too upset to tell him what happened and instead wanted to make a written statement. The written statement—describing in all essential respects the account Iltis gave at the preliminary examination—was admitted into evidence. (*Id.* at 116-28).

Evidence indicating that Cardwell's DNA was found on samples taken from the rape kit was admitted. (*Id.* at 139-64).

Flint Police Detective William Surface testified that he interviewed Cardwell at the fire station after the first incident. The hour-long video interview was played for the jury, and a transcript of it appears in the trial record. (*Id*. at 218-309).

During the interview, Cardwell admitted that he wanted to have sex with Iltis. He said that after Iltis closed the front door on him, he went through the back sliding door because he knew that it was unlocked. Cardwell acknowledged that Iltis told

him that she did not want to have sex with him, and she accused him of wanting to rape her. Cardwell was upset by the accusation. So, in response, he pushed her onto a bed and got on top of her to demonstrate to her that if he really wanted to, he had the ability to rape her. Cardwell explained that Iltis then became hysterical and during their tussling, he accidentally penetrated her vagina with his finger:

> [S]he fucking grabbed my lip. Tried to rip my lip off. Grabbed my ear. Tried to rip my ears off…. And I'm like this is what rape would be like…. So then I, um, I put her on the bed again…. I got on top of her and she's just like no. Let me go. Let me go…. Like if I wanted to rape you then this would be the process of raping you…. And then she kept saying the only thing you want to do is rape me, this, that, and the other. So then that's when I was like this would be rape and I kind of shoved her on the bed…. Laid on her…. So then I just pulled her pants down. And then that's when I got on top of her again and then just was just holding her down a little bit…. That's how the finger situation happened.

(*Id.*)

Detective Surface then drafted and read out loud to Cardwell a narrative summary of Cardwell's account. Cardwell indicated his agreement with the summary as it was read, and he signed the statement:

> Earlier today around 2100 hours I went over to my fiancé Ms. Iltis's residence on Cottage Grove at 531 Cottage Grove. I was upset with her at this time because she was calling me a rapist on Facebook. I also wanted to see our son Ronald Cardwell who's one. I do not stay at 531 Cottage Grove. I stay at 1925 Mallery. I met Ms. Iltis at the side door and requested to come in and see the children. Ms. Iltis shut the door in my face. I then walked to the back sliding glass door. I know this door does not lock. I opened this door and walked in. I talked with the children. I kissed my son. Ms. Iltis was fine with me for a little while. Then she said all you really want to do is rape me. This upset me. I

> shoved Ms. Iltis into the bedroom and talked and I said if I wanted to rape you this would be rape. I shoved her onto the mattress and laid on top of her. I did this to irritate her. Ms. Iltis told me to get off her. I got up. Then we began to argue again about her stating I wanted to rape her. I got upset and pulled her pants down, she wasn't wearing her underwear, and then shoved her back on the bed. I laid on top of her again and tried to talk with her. Ms. Iltis told me to get off her. Ms. Iltis got really upset and she moved to get up. I moved her back on bed and one of my fingers went into her vagina by accident. I was now holding both Ms. Iltis's wrists behind her head holding her to the mattress. At this time my penis could have come out of my pants because my pants sag and brushed passed Ms. Iltis's vagina. Then I stood up and then Ms. Iltis's friend came in the room. We wrestled. Then I ran outside and down the street. A neighbor tackled me then held me there until the police arrived.

(*Id.* at 305-09).

Cardwell testified in his own defense. With respect to the first incident, Cardwell testified that Iltis was drinking a lot and had a hot temper. He testified that he was confused why Iltis would say that he wanted to rape her. He explained that he was simply demonstrating to her what it would look like if he really wanted to rape her by showing her that he had the ability to take physical control of her. He testified that he told her "I didn't understand why you would even say that I would do anything like that to you and I love you." (*Id.* at 28).

Cardwell testified that he served time in jail for the first incident. After he was released in August 2016, he and Iltis continued their relationship. Cardwell was hesitant at first and lived with his mother because he did not want to violate his no-contact order. But Iltis was eager to rekindle the relationship. Iltis even attended the

welcome home dinner Cardwell's family organized for him, and she kissed him when she saw him. They moved back in together, but the two started to argue again. According to Cardwell, they fought about Iltis staying out late at night and seeing other men.

Cardwell testified that on the night of December 15, 2016, Cardwell was watching the children at their home. Iltis left around 10 p.m., claiming that she was going out to get medicine for Tres, but she did not come back. When she eventually returned much later than expected, Iltis told Cardwell that the police were on their way. Cardwell assumed that it was because Iltis was drunk. Instead, Iltis had called 9-1-1 and claimed that Cardwell choked her. Cardwell explained that Iltis had a drinking problem and spent time on probation for drunk driving.

With respect to the incident occurring the next day, Cardwell testified that he and Iltis had consensual sex and that there was no violent interaction as described by Iltis. He testified that after they had sex everything was fine, and they smoked cigarettes together. Afterwards, they both left the house, with Cardwell explaining that he decided to spend some time with his brother. (ECF No. 16-17, at 29-62).

Before cross-examination commenced, defense counsel objected to the prosecution's intention to use Facebook messages to impeach Cardwell's testimony that he was surprised by Iltis accusing him of wanting to rape her before the first incident. (*Id.* at 57-58). Cardwell asserted that the defense had just received the

Facebook messages. Defense counsel argued that the messages should be excluded because they were misleading, had been suppressed by the prosecution, and were irrelevant. The prosecution replied that it had not intended to use the messages, but Cardwell opened the door on direct examination by claiming that he had no idea why Iltis accused him of wanting to rape her before the first incident. (*Id*. at 59-61).

The Court ruled that it would allow the prosecutor to impeach Cardwell with the messages. (*Id.* at 61).

The Facebook conversation, which occurred just before the first incident, was admitted as a trial exhibit:

> A [Iltis]: You are telling me the only way you will take your kids as if I have sex with you. That's f***** up
>
> R: [Cardwell] Im telling u have sex wit me and u don't have to worrie bout drama me taking the kids nothing
>
> R: Me talking shit
>
> A: No. I should have to have sex with you to not have drama with you. That's f****** stupid and you make no sense
>
> R: Me coming ova to yo house It will not be nothing no drama 100 If u just do it u a see im not lying not lying
>
> R: I aint been more serious in my life
>
> A: Neither have i
>
> R: Just do and watch But that's so hard right

R: Im not going to get u Ok I don't want nothing to do wit these girls These girls is not the one who clam me down u are So if this is how u want it just because us can't give me u for a couple minutes then

R: Shit will not change how I feel bout u bout me missing u 100 It really could jusy be that easy U don't want easy U really is going t to make me not care bout life bout wanting to hurt that boy all cuz u don't care the way I feel

R: Its not going to stop bae till i can have u one time out of this hole 6 months Then I wouldn't even ask u no more Like right now u got all the opportunity to come ova a do it and I a get the kids U aint wit nobody u aint at work Nobody will no and then drama free 100

R: Just that simple

A: You are a terrible person

R: No im not im a person who miss having sex with his wife

A: I'm not your wife

A: F*** you. You don't even know the meaning of hurt my life is the meaning of pain and you just add to it because you don't care about anybody but yourself

R: Ok I guess shit bout to get worse then

A: K Im bout to just disappear then

R: Well that's what going to happen

A: Smh over sex tho. That shit literally makes me want to cry that ur doin this to me

R: It make me cry every day

A: I do not deserve this

R: Every day how much i miss u

A: Selfish selfish selfish U don't miss me. U want pussy You don't claim to love somebody and then try to ruin their life at the same time. That makes no sense

R: I do miss u Why u think I want to have sex wit u But I guess But u not giving it to me is going to land me in jail hurting yo friend and no seeing my kids for the rest of there life All ova u

A: I don't think you're lying. But I think you're sorry as f*** and I think you're pathetic. & I think that I need to get me and my kids as far away from you as possible

R: Well that's how its bout to be bae

A: Smh ok

R: Im sorry

A: No ur not

R: Ok But this bout to go down just like u want it Me gone

A: Not like I want it. Like u want it

R: How I want it is to have u for a few minutes and ever thing a be ok But u want it this way So be it

A: No u do. Cuz u wanna be a rapist

R: I told u this is the only way to keep me from acting the way i do

A: raping me

A: (Thumbs up emoji)

R: u not chaning yo mind me either

A: cuz ur a rapisy Rapist

R: Im not bout to change my mind if u don't i swear to god

A: Admit it. You're a rapist

R: Man i want it that bad to the point where i don't care anymore

A: Then admit it

R: Admit what

A: Ur a fuckin rapist

R: It aint like u bout to come fuck me

A: That's fuckin sick

R: Are u ?????

A: Really?

R: It's so simple

A: No I will not allow you to rape me

R: Stop saying that im not a rapist

A: Yes u are

R: But like I said u not changing yo mind im not either

A: Cuz ur a rapist

R: So get ready for the extra

R: The ova and beyond

A: Im not worried. Ur just gonna go to jail

R: That's what's bout to happen and im done talking about it

A: Ok

R: So serious K

A: Ok

A: I cant stop u.

R: U can But u don't want to stop me So u said what u had to and I said what I said So this how it bout to be

A: I'm not going to be raped. No one would choose to be raped. Make it make sense Ive been raped an u know that ur trying to do the same thing

R: Im done talking bout it

A: Ok

R: U not gone change yo mind me either So be it

A: Stop messaging me then

A: By the way while you're over here worried about getting pussy I just

(*Id*. at 64; ECF No. 16-24, PageID.1787-88).

The jury found Cardwell guilty of kidnapping and assault by strangulation. He was acquitted of first-degree criminal sexual conduct. The trial court subsequently sentenced him to a controlling sentence of 12-20 years for the kidnapping conviction and a lesser term for the assault conviction. (ECF No. 16-20).

Cardwell filed a claim of appeal in the Michigan Court of Appeals. His appointed appellate counsel filed a brief on appeal that raised the following claim:

> I. The trial court committed reversible error by allowing cumulative and confusing evidence of prior acts of domestic violence to be presented to the jury.

(ECF No. 16-24, PageID.1762).

Cardwell also filed a supplemental pro se brief that raised an additional claim, but he does not raise it in the present action:

> II. Trial counsel deprived Mr. Cardwell of his constitutional right to effective assistance of counsel by failing to object on the count of kidnapping. Mr. Cardwell was never convicted with any of the elements surrounding the kidnapping statute.

(ECF No. 16-24, PageID.1863).

The Michigan Court of Appeals affirmed Cardwell's conviction in an unpublished opinion. *People v. Cardwell*, No. 343436, 2020 WL 970666 (Mich. Ct. App. Feb. 27, 2020); (ECF No. 16-24). Cardwell raised the same claims in the Michigan Supreme Court, but his application for leave to appeal was denied by standard order. *People v. Cardwell*, 956 N.W.2d 187 (Mich. 2021) (Table); (ECF No. 16-26).

Cardwell then his federal habeas petition, and soon thereafter he filed a motion to stay the case so he could return to state court to raise additional claims. The Court granted the motion. (ECF Nos. 6, 8).

Cardwell returned to the trial court and filed a motion for relief from judgment that raised the following claims:

> I. Ineffective assistance of appellate counsel. Appellate counsel failed to appeal Cardwell's inaccurate scoring of the OVs and guidelines on direct appeal when trial counsel preserved the issue.
>
> II. Appellate counsel failed to appeal on a *Brady* violation on Cardwell's direct appeal when trial counsel preserved the issue.

(ECF No. 16-22).

The trial court denied the motion for relief from judgment, finding that the claims were procedurally barred under Michigan Court Rule 6.508(D)(3). (ECF No. 16-23, PageID.1702-03).

Cardwell appealed, but the Michigan Court of Appeals denied leave to appeal because Cardwell "failed to establish that the trial court erred in denying the motion for relief from judgment." (ECF No. 16-25, PageID.1924). The Michigan Supreme Court likewise denied leave to appeal by standard order. (ECF No. 16-27, 2414).

Cardwell then filed an amended federal habeas petition, and the Court reopened the case. (ECF Nos. 10, 14). Respondent filed a responsive pleading, and the case is now ready for decision.

## II. Standard of Review

28 U.S.C. § 2254(d)(1) curtails a federal court's review of constitutional claims raised by a state prisoner in a habeas action if the claims were adjudicated on the merits by the state courts. Relief is barred under this section unless the state court adjudication was "contrary to" or resulted in an "unreasonable application of" clearly established Supreme Court law.

"A state court's decision is 'contrary to' ... clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003), quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).

"[T]he 'unreasonable application' prong of the statute permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Cardwell*, 539 U.S. 510, 520 (2003) quoting *Williams*, 529 U.S. at 413.

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011), quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). "Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal.... As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended

in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103 (internal quotation omitted).

## III. Discussion

### A. Other Acts Evidence

Cardwell first asserts that the trial court erred in allowing the admission of evidence regarding the first incident. Cardwell acknowledges that Michigan law allowed the prosecutor to elicit testimony from Iltis herself about the prior incident, but he argues that the sheer amount of other acts evidence—his recorded statement to police, the testimony of the officers involved in the first incident, and the Facebook messages—resulted in a substantial part of the case against him being about the prior incident. He argues that the admission of all this additional evidence violated Michigan Rule of Evidence 403 because it was overly prejudicial compared to its probative value. Cardwell did not present the state courts with an argument that the additional prior acts evidence violated his federal constitutional rights, nor does his habeas petition assert that his federal rights were violated. (ECF No. 1, PageID.23-31, 67-72).

A Michigan statute provides that "in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other acts of domestic violence is admissible for any purpose for which it is relevant, if it is not otherwise excluded under Michigan Rule of Evidence

403." MICH. COMP. LAWS § 768.27b(1). Unlike prior-acts evidence admitted under Michigan Rule of Evidence Rule 404(b), evidence of prior domestic violence is admissible at trial in Michigan "to show a defendant's character or propensity to commit the same act," *People v. Railer*, 792 N.W.2d 776, 780 (Mich. Ct. App. 2010), "as long as the evidence satisfies the 'more probative than prejudicial' balancing test of MRE 403." *People v. Cameron*, 806 N.W.2d 371, 377 (Mich. Ct. App. 2011).

Cardwell's argument that the admission of the challenged evidence violated state law because it should have been excluded under the Rule 403 balancing test does not state a cognizable claim. To be entitled to federal habeas relief, a petitioner must show that he is being held in custody in violation of his federal constitutional rights. 28 U.S.C. § 2254(a). Federal habeas relief is not available for alleged state-law errors. *Estelle v. McGuire*, 502 U.S. 62, 67 (1991); *Pulley v. Harris*, 465 U.S. 37, 41 (1984). Thus, an argument that a state court misapplied or unreasonably applied Rule 403's balancing test is not cognizable on federal habeas review because it asks the Court to evaluate the state court's application of a state evidentiary rule. *See Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000). Indeed, a federal habeas court is bound by determinations of state law made by a state appellate court on direct review. *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005).

Furthermore, Cardwell may not for the first time here assert that the admission of this evidence violated his federal rights. Before a claim can be presented on

federal habeas review, a petitioner must fairly present it to the state courts to satisfy the exhaustion requirement. 28 U.S.C. § 2254(b); *Picard v. Connor*, 404 U. S. 270, 275-78 (1971). To satisfy this requirement a petitioner must present the state courts with same legal basis for a claim that he presents to the federal court. *See McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000). Because Cardwell did not present the state courts with a federal basis for his first claim, he may not do so here. And as it was presented to the state courts, Cardwell's claim is not cognizable.

Even if Cardwell had presented his claim as a federal one to the state courts, it would still not merit habeas relief. To demonstrate entitlement to habeas relief a petitioner must show that "the state's evidentiary ruling is so fundamentally unfair that it rises to the level of a due-process violation." *Moreland v. Bradshaw*, 699 F.3d 908, 923 (6th Cir. 2012) (punctuation modified); *Estelle*, 502 U.S. at 67-68. But there is no clearly established Supreme Court law holding that a state violates a defendant's federal constitutional rights by admitting prior domestic assault evidence, even if that evidence is used to establish that the defendant has a propensity to commit domestic assaults. *See Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003) (clearly established Supreme Court law does not forbid admission of propensity evidence).

In any event, the Michigan Court of Appeals reasonably explained why it was not more prejudicial than probative for the challenged evidence to be admitted, and

therefore it follows that the admission of the evidence was not fundamentally unfair. *Cardwell*, 2020 WL 970666, at *3-6. Cardwell's trial defense was that Iltis's account of the second incident was not credible and that the sexual encounter was consensual. Evidence that months before this incident Cardwell had engaged in a similar assault – an account that was corroborated by Cardwell's own statement to police, Iltis's contemporaneous account to police, and by the Facebook messages – was therefore highly probative to demonstrate that the second encounter was also nonconsensual.

With respect to the second incident, Cardwell testified that Iltis was hot-headed, tended to drink a lot, had relationships with other men that he disapproved of, and that she therefore falsely accused him out of anger. The evidence regarding the first incident painted the relationship in an entirely different light. The Facebook messages quite explicitly showed that Iltis was afraid that Cardwell would rape her, and Cardwell's responses indicated that he was demanding sex from her whether she consented or not. Then, during police questioning after the first incident, Cardwell unabashedly told the detective that he was simply demonstrating to Iltis what a rape would look like and that he had the ability to overpower he if he wished to. Cardwell then gave the explanation that it was during the rape demonstration that his finger may have accidentally penetrated her vagina, and that his penis (which was unintentionally exposed due to Iltis struggling against his loose-fitting pants) may or may not have touched her vagina also. In the same account, Cardwell acknowledged

that Iltis was simply being hysterical, repeatedly asked him to stop and get off her, and repeatedly accused him of wanting to rape her. In sum, Cardwell's own statements and testimony regarding the first incident showed that he had no awareness of Iltis's right to bodily autonomy – calling into serious question his ability to accurately describe whether the second incident involved consensual sex or not.

As indicated, Michigan law allows for prior incidents of domestic assault to be used as propensity evidence. Such evidence is especially probative because it gives the jury a "full and complete picture" of a defendant's history with a domestic partner, and that history "tends to shed light on the likelihood that a given crime was committed." *People v. Cameron*, 291 Mich. App. 599, 610 (2011). While evidence regarding the first assault of course had a tendency to cause unfair prejudice because it involved another horrific encounter, it was nevertheless reasonable for the state court to conclude that the danger of unfair prejudice did not outweigh the powerfully probative value of the evidence.

Cardwell's first claim is not cognizable and without merit.

<u>B. Claims Raised in Post-Conviction Review Proceeding</u>

Cardwell's second claim asserts that the prosecutor suppressed the Facebook message exchange used to impeach him at trial and that his sentencing guidelines were scored incorrectly. He further asserts that his appellate counsel was ineffective

for failing to raise these two claims on direct appeal. Respondent asserts that review of these claims is procedurally barred.

A habeas petitioner's claim is procedurally defaulted when the state court considering the claim rejects it on an independent and adequate state procedural rule. *See Martinez v. Ryan*, 566 U.S. 1, 9 (2012); Wainwright v. Sykes, 433 U.S. 72, 85-87 (1977).

The trial court denied relief with respect to Cardwell's post-conviction claims by explicitly finding that review was barred under Michigan Court Rule 6.508(D)(3) for Cardwell's failure to raise the claims on direct review. (ECF No. 16-23, PageID.1702-03). The court also found that Cardwell failed to demonstrate that his appellate counsel was ineffective for failing to raise the claims, accepting appellate counsel's statement in a letter to Cardwell that she was raising the only claim on direct appeal that she thought had merit. (Id.)

The trial court's reliance on Rule 6.508(D)(3) as the ground for decision constitutes the invocation of an independent and adequate state procedural rule barring federal habeas review of the claims. *See Gurnsey v. Prelesnik*, No. 11-15038; 2014 U.S. Dist. LEXIS 66771, at *27 (E.D. Mich. May 15, 2014) (citing Rule 6.508(D)(3)(b); *Ivory v. Jackson*, 509 F. 3d 284, 292-93 (6th Cir. 2007); *Howard v. Bouchard*, 405 F. 3d 459, 477 (6th Cir. 2005)); *see also Guilmette v. Howes*, 624 F.3d 286, 291 (6th Cir. 2010) (en banc) (describing Mich. Ct. R. 6.508(D)(3) as a

"procedural-default rule"). The later unexplained orders issued by the Michigan Court of Appeals do not remove the default. *See Guilmette*, 624 F.3d at 291 (where basis appellate court decision is ambiguous, habeas court looks to trial court decision to determine if a procedural default was imposed).

To overcome the procedural default, Cardwell must demonstrate "cause" for noncompliance with state procedural rules and "actual prejudice" resulting from the alleged constitutional violation. *See Coleman v. Thompson*, 501 U.S. 722, 750-51 (1991); *Nields v. Bradshaw*, 482 F.3d 442 (6th Cir. 2007). "Cause" means that some external impediment frustrated the petitioner's ability to comply with the state's procedural rules. *See Murray v. Carrier*, 477 U.S. 478, 488 (1986). Such impediments include interference by officials, attorney error rising to the level of ineffective assistance of counsel, or a showing that the factual or legal basis for a claim was not reasonably available. *See McCleskey v. Zant*, 499 U.S. 467, 493-94 (1991).

Cardwell asserts that the ineffectiveness of his appellate counsel excuses his default. To demonstrate ineffective assistance of appellate counsel, a habeas petitioner must show that his counsel performed deficiently and that but for the deficient performance there is a reasonable probability of a different result on appeal. *Smith v. Robbins*, 528 U.S. 259, 285 (2000). Appellate counsel, however, need not "raise every nonfrivolous claim on direct appeal." *Monzo v. Edwards*, 281 F.3d 568,

579 (6th Cir. 2002). Rather, a petitioner can overcome the presumption of effective assistance of counsel only by showing that the "[omitted] issues are clearly stronger than those presented." *Id*.

Neither of the defaulted claims are "clearly stronger" than the one appellate counsel raised on direct review. The trial court accepted appellate counsel's assessment that the unraised claims were without merit. (ECF No. 16-25, PageID.2023-24). The Court agrees.

With respect to the alleged suppression of the Facebook messages, Cardwell must establish that: (1) the prosecutor suppressed evidence, (2) the evidence is "favorable" to the defense, and (3) the evidence is "material" to the case. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963). First, the message was not suppressed. As Cardwell was a participant in the message exchange, the evidence was known to him prior to trial. *See Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000). Furthermore, nothing in the Facebook messages were favorable to the defense. The messages were used by the prosecutor to impeach Cardwell's testimony that he did not know why Iltis accused him of wanting to rape her. Cardwell's *Brady* claim is thus not clearly stronger than the one raised by appellate counsel on direct appeal.

As for the sentencing guidelines claim, Cardwell contends that he was erroneously assessed points for the offense variables concerning: (1) exploitation of a domestic relationship, (2) sexual penetration occurring during an offense, and (3)

an offense involving a pattern of felonious criminal activity. (ECF No. 16-25, PageID.2007-12.) A claim that the state trial court incorrectly scored or calculated the sentencing guidelines range under state law is not a cognizable claim for federal habeas review. *See Tironi v. Birkett*, 252 F. App'x 724, 725 (6th Cir. 2007); *Howard v. White*, 76 F. App'x 52, 53 (6th Cir. 2003). The trial court agreed with appellate counsel's assessment that this claim lacked merit. This Court will not second-guess a determination by the state court that a state-law claim lacks merit.

Accordingly, Cardwell's post-conviction claims are procedurally defaulted, and he has failed to demonstrate cause to excuse the default.

## IV. Certificate of Appealability

Because none of Cardwell's claims merit habeas relief, the petition will be denied. Before Cardwell may appeal this decision, the Court must determine whether to issue a certificate of appealability. *See* 28 U.S.C. § 2253(c)(1)(A); FED. R. APP. P. 22(b). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To satisfy § 2253(c)(2), Cardwell must show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citation and internal quotation marks omitted). The Court finds that reasonable

jurists would not debate the resolution of any of Cardwell's claims. The Court will therefore deny a certificate of appealability.

## V. Conclusion

Accordingly, the Court 1) **DENIES WITH PREJUDICE** the amended petition for a writ of habeas corpus, and 2) **DENIES** a certificate of appealability. The Application to Proceed Without Prepaying Fees or Costs **(ECF No. 18)** is **MOOT** since the filing fee was paid. (ECF No. 1, minute entry)

**SO ORDERED.**

s/Denise Page Hood
Denise Page Hood
United States District Judge

Dated: September 30, 2026